## REID, ET. AL., V. HART.

1. COST—EJECTMENT: *Title acquired by defendant after suit.*
   When a defendant in ejectment acquires the plaintiff's title after the suit is brought, the plaintiff is entitled to a judgment for cost up to the time of the transfer of title.

2. JURISDICTION—PROBATE: *For sale of infant's lands.*
   Ever since 1846 the jurisdiction of the probate court for the sale of a minor's lands upon application of his guardian, has been in the court of the county in which the land lay; but whether exclusive, *Quere?* Section 4998, Mansfield's Digest, has no application to sales by guardians.

3. PROBATE SALES—CONFIRMATION: *Evidence of.*
   Sales of real estate under orders of the probate court pass no title until confirmed by the court. The recital of confirmation in the purchaser's deed is *prima facie* evidence of the fact, if the deed be properly acknowledged and recorded.

4. ACKNOWLEDGMENT OF DEEDS: *Curing act of 1883.*
   The act of 1883, validating defective acknowledgments, applied as well to deeds involved in suits pending at the passage of the act as in actions brought since then. One can not have a vested right in a rule of evidence.

5. PRACTICE IN SUPREME COURT: *Finding of Judge.*
   In determining matters of fact depending upon oral testimony, in whole or in part, the same rule as to conclusiveness is applied to the finding of a judge as to the verdict of a jury.

APPEAL from *Sebastian* Circuit Court.
Hon. R. B. RUTHERFORD, Circuit Judge.

*Clark & Williams,* for Appellant.

It signifies nothing that Featherstone's deed to his wife was void, for under his contract and power of attorney he acquired general rights, as against his clients at least, after he had commenced suit and gone to expense, which they did not have the power to deprive him of. He certainly had a right to prosecute the suit in their name to recover, if Hart had no title, which they could not deprive him of by a sale. The power was

coupled with an interest and could not be revoked. The con-
tract was a transfer of the lands to Featherstone, at least to
the extent of his fees. *Gist v. Hanley, 33 Ark., 233.* The
main contention was that the guardian's deed was void, and if
this was true, Featherstone had right to a judgment. There is
nothing to show that Featherstone had any notice of this guar-
dian's deed, and the deed is not acknowledged in such manner
as to entitle it to record. It was no notice to him, and he was
an innocent purchaser without notice. No order of the Probate
Court was made or entered of record directing the sale of the
land, nor was the sale confirmed. The utmost that Hart could
take, under the deed of Bates, would be the value of Reed's
half interest in the lands purchased *pendente lite.*

*Clendenning & Sandels* for Appellee.

The form of the conveyance was good; the acknowledg-
ment was bad, but it is now validated. *Acts 1883, p. 107; Ib.,
p. 129.* Proceedings under chapters of the Digest, p. 102, Sec.
33, were validated by *Acts 1873, p. 25, Secs. 1 and 3.*

The deed from Featherstone to his wife was void, because,
1st, Of fraud in its execution.
2d, He could not convey trust property.
3d, Bates bought in good faith, without notice.
4th, The marriage of Julia R. before acknowledgment was
a revocation of his power of attorney.

As to the fourth reason, see *2 Kent's Com., 645; 7 Taunt.,
453; 8 Wheat, 174;* and as to the others, *4 Ves. Jr., 411; 14 Id.,
504; Sugden, Vendors & P., 109; 2 John Chy., 252; 4 Howard,
552; 64 Penn. St., 325; 48 Barb., 637.*

As to the second objection to the deed, see *Gantt's Digest,
Section 861.*

EAKIN, J.    J. C. and Julia Reed, heirs of Reuben Reed, who
died seized, in 1865, sued Hart in ejectment, on the 9th of

August, 1882, to recover a forty-acre tract of land in Scott county.

Hart answered, denying the right of Plaintiffs, or that he unlawfully held possession. He pleaded the Statute of Limitations, of seven years, and set up title in himself, by virtue of a deed from Jacob C. Moles as guardian of Plaintiffs, executed in 1872, and exhibited with the answer. It recites that Moles, of Arkadelphia, in Clark county, as guardian of Plaintiffs, by order of the Probate Court of Scott county, on the 4th day of October, 1871, had been empowered to sell and convey certain real estate of said minors; that he had taken the required oath and given the required bond, and given four weeks' notice by publication; that pursuant to said order he had, on the 22d day of January, sold the tract in question to J. G. Hart for $150, and reported the sale to the Scott county Probate Court, which was confirmed. Then follows the conveyance.

Plaintiffs filed exceptions to this exhibit, having first, however, amended the complaint, introducing Annie Featherstone as a party plaintiff, and alleging that, on the 11th of September, 1882, she had purchased the land from the Reed heirs for $1000, and obtained a conveyance regular in form and duly recorded.

The cause was transferred to the Fort Smith district of Sebastian county, where the exceptions to the deed from Moles to Defendant were overruled.

Defendant made an amended and supplemental answer, showing that pending the suit, on the 20th of November, 1882, Plaintiffs, for a valuable consideration, had sold the land to one Bates, who afterwards for valuable consideration conveyed to Defendant, exhibiting the deeds. He denies Annie Featherstone's right, saying that the deed under which she claims was executed to her by her husband as agent of Plaintiffs, without consideration and with intent to defraud them, and that Bates when he purchased from the heirs had no notice of it.

The cause was submitted to the Court on law and facts. The Judge found that Reuben Reed died seized, leaving Plaintiffs his only heirs; that his personal representatives, and Moles the guardian of his children, were all appointed and qualified by the Probate Court of Clark, and not of Scott, county; that the Probate Court of the latter county, in October, 1871, made an order authorizing Moles, as guardian, to sell certain lands belonging to his wards, in Scott county, including this tract; that he sold it to Defendant on the 22d of January, 1872, and conveyed it by deed, which sale was reported and confirmed; but that it was not properly acknowledged, although filed for record on the 2d of June, 1873; the Defendant has since been in possession under the deed.

Also, that on the 30th of January, 1882, the two wards, being both of age, agreed with Featherstone that he should at his own expense bring suits for certain lands in Scott county, which had belonged to their father. If he recovered nothing he was to pay all the costs. They were to give him half of all he might recover, in land or money, by compromise or otherwise. This agreement was not acknowledged or proven so as to be admissible to record. At the same time they gave him a power of attorney, which it was conceded might be regarded as part of the same transaction with the agreement, to be construed together. The power of attorney made him their general agent for all lands in Scott county inherited from their father. It empowered him to bring suits, and sign their names, and do all things as fully as if they were present doing it in person, and in doing so to use his own judgment. This was acknowledged and filed for record on the 18th of February, 1882. This suit was begun under that authority. That Featherstone, by deed purporting to have been executed on the 11th of September, 1882, but not in fact acknowledged until the 22d or 23d, nor recorded until the 4th of December, conveyed to his wife, Annie, all the land covered by the power of attorney, for the expressed consideration of $1000 in cash. That nothing

Reid, et al., v. Hart.

was paid by her, but it was agreed that $500 was to be paid for the Reeds about the middle of the following March. The other $500 she was to pay one Gilbreath upon a debt her husband owed him. These arrangements were by parol. No note nor security was given. She had no separate estate nor money. The execution of this deed was not known to the Reeds until about the middle of December. That meanwhile, on the 20th of November, 1882, the Reeds sold their interest in the lands to Bates for $500 cash, by deed with special warranty, which he had in his possession before the record of the Featherstone deed, and without notice of it. He did, however, have notice of the power of attorney, and that Featherstone had brought the suit under a contract by which he was to have some interest in the land. That Plaintiff Annie tendered the $500 to the Reeds at the time appointed in March, which they refused to accept. That John C. Reed was born in 1860; and Julia in 1863; and the latter was married on the 21st of September, 1882.

After divers declarations of law, which it is unnecessary to consider, inasmuch as the judgment must stand or fall by the application of the correct law to the facts, the Court rendered judgment for the Defendant, that he retain the land and recover costs. The Plaintiffs appealed.

The death of the ancestor in possession, with proof of the character of Plaintiffs as sole heirs, and of the adverse possession of Defendant at the time of suit, made a *prima facie* case for Plaintiffs; and unless it be shown that a better title became vested in the Defendant before suit, the Plaintiffs would at least have been entitled to a judgment for costs up to the time when a better title was acquired by Defendant *pendente lite*, if he acquired any. His only claim to title before suit, was under the purchase from the guardian of the Reed children at the sale ordered by and conducted under the Scott county Probate Court.

1. COST. When title acquired by defendant pending suit.

Reid, et al., v. Hart.

2. Jurisdiction for sale of infants' land: Where? The first question presented regards the jurisdiction of that Court to make such order and confirm the sale.

The proof, although not very definite on this point, tends to show that Clark county was the domicile of the ancestor at the time of his death. Letters of administration were there granted on his estate, and the Probate Court of that county appointed the guardian for his children. They seem to have resided during minority in Clark, and so far as appears were never in Scott.

The order for sale was made by the Scott county Probate Court in October, 1871. Proceedings for the sale of the real estate of minors were then regulated by the *Act of December 23, 1846, Secs. 1 and 2*, which were brought into *Gould's Digest, p. 134.* It is provided, amongst other things, that "the Probate Court" shall have power, upon filing the proper affidavit therein prescribed, to grant orders to administrators, executors and guardians, to sell any or all real estate, belonging to any estate, not otherwise provided for. It fails to designate what Probate Court is meant, whether the one appointing and controlling the guardian, or the court of the county in which the lands lay. This is the first act providing for the sale of a ward's land, upon application of a guardian, by order of a Probate Court, although that power always existed in the Court of Chancery, upon equitable principles. There had, however, been provisions made for the sale of lands, on the application of administrators and executors, for the payment of debts. They were adopted early in our state history, being found in the Revised Code (Sec. 147) and remained in force until the adoption of the Civil Code of 1868. They required that the application for such an order should be made to the Probate Court of the county *in which the lands are situate*. The Act of December 23, 1846, enlarged the scope of purposes for which such sales might be made, and associated "guardians" with personal representatives (*ubi supra*) but made no change as to the tribunal. It may fairly be inferred that,

by this association, the Legislature contemplated that guardians should conform to the same rule, and make their applications for the sale of lands in the county where they lay. This view derives strength from a supplemental or cumulative act on the same subject, approved January 17, 1855, (*Gould's Digest, p. 135,*) in which guardians are again grouped with personal representatives, and it is provided that the sales shall be ordered whenever it is made to appear to the satisfaction of the Probate Court of "*the proper county.*" So general a phrase would not be used if there were a certain court, that is the one issuing letters, to which application should be made, but it is very apt, in reference to property which may be in any county in the State—thus giving jurisdiction to that particular county. It seems that under the law as it existed up to the time of the Civil Code of 1868 there can be but little question of the jurisdiction of the Probate Court of the county in which the lands were situated.

The Civil Code provided (Sec. 88) that *actions* for the sale of real property, amongst other things, must be brought in the county in which the personal representative of the deceased person *was qualified.* This Court held in *Gordon v. Howell, 35 Ark., 383,* that this applied to applications made by executors and administrators to the Probate Court, for orders to sell lands to pay debts. But it obviously has no application to guardians, who are permanent, and can have no concern about where the personal representative may have been qualified, whose duties are transient for the purpose of settling the estate. A guardian, for instance, may be appointed for a minor devisee, whose property and residence may be far distant from the forum where the personal representative may have qualified.

The idea that applications for sales by guardians should be made to the forum where the lands lie seems to have survived the Code. At a session of the Legislature held in November, 1868, the passage of some chapters of what was intended to be a

Reid, et al., v. Hart.

general code of laws was attempted.   By the 33d section of the chapters on "curators, guardians, and wards" it was provided that real estate of minors might be sold, whenever it might appear to be for his benefit to do so in order that the proceeds might be re-invested; and that his guardian or curator might obtain an order for the purpose "from the circuit court of the county in which such real estate, or the greater part of it, might be situated."   This "Digest," as it was called, did not take effect, having been rejected by this Court on constitutional grounds affecting the mode of its adoption, *Vinsant v. Knox, 27 Ark., 266,* but it is indicative of the prevalent legislative sense, at the time, of the proper practice, or rather the better policy, as to the forum to be adopted in such cases.   It is noteworthy, too, that five years afterwards, by act of April 22, 1873, the same section was re-enacted.   Pamphlet Acts of 1873, p. 194.   This last statute, it is true, did not affect this sale, which was ordered in 1871, but it goes somewhat to fortify the idea that the continued policy for the state was and had been to leave the jurisdiction in such matters, where, by strong inference at least, it had been originally placed by the act of 1846.   This is law to this day, and has been brought forward into Mansfield's Digest, Sec. 3509. This displays a system by which we endeavor to supply the omission in the act of 1846, which fails to designate the probate court meant, by reasoning from the organic unity of the whole system.   *Lieber's Hermeneutics, Hammond's Notes, p. 278.*

It is not necessary to hold that in this case the jurisdiction of the Probate Court of Scott was exclusive.   There are many instances in which the same jurisdiction may co-exist in several tribunals, to be exercised by the one first acquiring it.   It will be enough to decide this point when it may arise.   Our present concern is with the jurisdiction as it existed in 1871 and 1872, when the Probate Court of Scott made the orders.   From the best light which we can bring to bear upon an obscure, and very doubtful question, we have been led to conclude that the pro-

*Whether exclusive, Quere?*

Reid, et al., v. Hart.

ceedings of the Scott Probate Court should be held valid, as within its jurisdiction.

But this does not determine the case. The burden was on the Defendant to show that it had been duly confirmed, as without confirmation the sale would not be effective to pass any title. This confirmation will not be presumed, under the rule that applies when probate courts have jurisdiction, that all things were done rightly unless the contrary is affirmatively shown. The meaning of that rule is, that when a substantial order or judgment is shown to have been made, it will be presumed that all the proper preliminary steps have been taken, which were necessary to make such order or judgment correct, that is after jurisdiction has been acquired—that is to say, it will be presumed that the Court proceeded orderly from the time jurisdiction attached to the effective judgment. But the presumption will not extend to show that the final order, consummating the proceedings, has been itself made as a matter of course, for, perchance, the Court may not have seen fit to make it out at all. There must be proof. The recitals of the guardian's deed would afford *prima facie* proof of the confirmation if properly acknowledged and recorded. *Gould's Digest, p. 269, Sec. 30.* It was filed for record on the 2d day of June, 1873, but was never acknowledged in accordance with the law then existing. The certificate only shows that the guardian appeared before the officer and acknowledged "in due form of law" that the instrument was "his act and deed as such guardian." It omits to state "*totidem verbis*" that it was executed "for the consideration and purposes therein mentioned and set forth;" and it was not necessarily to be inferred that it had been so executed, from the expression that the acknowledgment had been made in due form of law, for an insufficient acknowledgment as to matter may be made in legal form. The matter acknowledged should appear with certainty.

3——45

Reid, et al., v. Hart.

4. ACKNOWL-
EDGMENT OF
DEEDS: Curing
act of 1883.

This cause was submitted to the Court below, without a jury, on the 29th of June, 1883. Pending the suit an act was passed, on the 8th of March, 1883, (Pamph. Acts, p. 106,) rendering valid the record of all instruments prior to the first day of January preceding, which *purported* to have been executed before any officer, and which had not been theretofore invalidated by some judicial proceeding, notwithstanding such acknowledgment may have been on any account defective. This statute applies to suits then pending, as well as to those thereafter to be brought, and placed this guardian's deed upon the same footing as an instrument of evidence as if it had been properly acknowledged at first, unless rights had meanwhile become vested in other innocent parties. This leads us to investigate the nature and origin of the claim set up by Mrs. Annie Featherstone.

She claims under a deed executed to her by the Plaintiffs, J. C. and Julia Reed, by and through her husband, who was their attorney at law and in fact. It was made in the name of the heirs alone, pending the suit, and embracing all the lands belonging to their father, for which they had brought suit against different defendants in Scott county, holding under similar conveyances made by the guardian. It professes to convey the whole interest, without any recognition of Featherstone's claim to a half, as fees. No consideration was paid by Mrs. Featherstone, and, being covert, she could not make a personal contract to pay any. Her husband, who knew nothing of the sales by the guardian, who had made a speculative bargain with the Reed heirs for a half of the proceeds, to recover the lands or money on compromise or on sales, of their possible right, transacted the whole business. The Reeds did not know of it. Besides which, the Defendant had been in actual possession, claiming under the guardian's deed. There is no reason to attribute fraud to Mrs. Featherstone, nor, perhaps, was actual fraud intended by her husband. He made an effort to bolster

Reid, et al., v. Hart.

the suit by the introduction of his wife as claimant, intending to account to Plaintiffs for half the purchase money. Whether it was enough or not does not concern Defendant. But he may well contend that Mrs. Featherstone was not an innocent purchaser at all. That she stood simply in the shoes of the original Plaintiffs, and had no such vested right as would prevent the operation of the curing act. As for Featherstone he was no party to the deed nor the suit, nor was he part owner of the lands. His interest was only in the result of the suit. Mrs. Featherstone does not occupy the position of a *bona fide* purchaser for value.

It is not necessary to invoke the aid of the curing act above cited in order to give the deed of Moles validity as a conveyance. Its execution was not denied, and if the sale had been confirmed it would have passed title without recording. The statute makes it evidentiary only when acknowledged and recorded. The curing act, in this application of it, places the deed of the guardian upon the footing that it would have occupied *as evidence*. Laws regulating evidence may embrace past transactions. One cannot have a vested right in a rule of evidence. The deed was properly considered as affording by its recitals *prima facie* evidence that the sale had been confirmed by the Probate Court. This was enough for Defendant unless this evidence be rebutted by counter evidence, preponderating to show that it had not.

Upon this point there is only oral testimony—that of one witness, L. D. Gilbreath, the clerk of the Probate Court during 1871 and until the fall of 1872. He says that he was constantly in court during its sessions, and has no recollection of any application made by said guardian for the confirmation of any of the sales of the lands of the Reed estate, although he remembers the sale very well. In the summer of 1882, he examined the records, in company with Featherstone, beginning at a point before the order of sale was made, and carefully

5. Finding of Court on oral evidence conclusive in Supreme Court.

examining the records "as to all matters enrolled from that time till late in. 1873," page by page, and order by order.   He could find no order of confirmation in any of the proceedings of the court, and was well satisfied that no such order was ever made. This, as the testimony reads in the transcript, is as strong proof of a negative as can be made upon the credence to be given to the memory of a single unimpeached witness.   Yet it is not conclusive.   In determining matters of fact depending upon oral testimony in whole or in part, the same rule is applied to the finding of a judge, as obtains with regard to juries.   Bills of exceptions rarely give the language of witnesses literally, but only the substance and effect.   There is always much which cannot be represented in writing which may nevertheless influence triers of fact, whether judge or jury.   Manner, tone, general appearance, terms of expression, readiness, equivocation, hesitation, reluctance, evident bias, and many other nameless indications occur, which cannot be imported into the bill of exceptions, and determine the weight to be given to the testimony of any individual.   These things are all apparent to the jury and the judge.   Hence the rule has been established that where the jury has found a fact, which does not seem so contrary to the evidence as to have induced the Circuit Judge to grant a new trial, this Court will not do so, unless there be something shocking in the preponderance to the contrary, something to make it apparent that the jury had acted under passion, or prejudice, or undue bias, or a mistaken view of the law, and that the Circuit Judge had not wisely exercised his power in refusing a new trial.   This Court has several times indicated, however, that this rule does not bind the Circuit Judge himself in jury cases.   He is there in the arena, and everything transpires under his eyes.   He ought to grant a new trial whenever he is strongly impressed with the conviction that the findings are erroneous.   His action in doing this cannot be reviewed.   It is a delicate discretion given him in truth, and it is because he has

that and is supposed to have exercised it, that this Court, in deference to his better means of understanding the case, has adopted and adhered to the rule announced. It obviously applies where the Judge has himself tried the facts upon oral testimony.

The deed of the guardian recites that the sale was reported and confirmed on the 22d day of January, 1872. It was made and acknowledged on the 3d of February following. As it could not recite a future event, there was no necessity for extending the examination beyond that date, or for examining any prior to the order of sale made at the October term, 1871. It would have been more natural and satisfactory, and indeed the ordinary prompting of a business man, to have turned first to the records of 22d January, 1872, to see if any orders at all were made on that day, and what they were. If none were found, to have carefully read the record at length, down to the execution of the deed, and back to the time of making the order. Such an examination would have inspired more confidence than one made by running over the record of nearly two years, looking at order by order upon each successsive page. Human attention flags with monotonous occupation and becomes less alert. The witness says he examined very carefully, but that may mean much or little, according to the individual's idea of care. He does not say he read the orders at length. We think we may presume that records may not be always, and necessarily, kept neatly and well arranged. Titles and captions may be mistaken, and different orders may be in such juxtaposition as to seem but one to a casual observer. The records were subsequently burned, and the accuracy of the examination cannot be verified.

These are simply considerations to show that the proof against the confirmation may reasonably have been considered by the Circuit Judge insufficient to overturn the *prima facie* case made by the recital. We have no reason to suppose that the

·examination was not made with fidelity in the mode adopted, and if the case were here on purely written testimony might hold that it was sufficient to overthrow the recital. But that was a matter of which the Circuit Court had better opportunity for judging than we have here.

There is one very potent consideration bearing upon this point generally, without special reference to the case in judgment. The object in making any recitals of a court's proceedings in a deed *prima facie* evidence, is to make them better assurance of a title, and to relieve the grantee and those claiming under him from the burden of preserving certified copies of the proceedings, and to furnish ready proof at all times, and the only proof in case of the loss of the records by fire or other accidents. It would to a considerable extent defeat this policy if, after the loss of the records, with no chance left to verify the recitals, they should be overturned by any oral testimony except of the most convincing nature. It would afford sometimes the strongest temptation to perjury in cases where it might be committed with almost absolute impunity, and would make titles depend upon the strength or weakness of human memory after a lapse of years. The witness here as to the matters of personal recollection speaks after a lapse of ten years from the time of the event, during which, as he himself states, his attention was never called to the point, as to whether there had ever been a confirmation or not. We cannot say that the Honorable Circuit Judge against evidence found that there had been a confirmation.

This is not a case in equity and no discussion of the equitable principles involved would be in good taste. We forbear any comment upon the nature or validity of the contract made with Featherstone by the heirs. We are not prepared to hold, under our own decisions and the more recent decisions of other American states, that it was void at law for champerty and maintainance. But the utmost effect of it, conceding it to be

valid, would give neither to Featherstone nor to his wife any title which the heirs of Reed did not have after the guardian's sale.

We may say that the decision and judgment of the Circuit Court seems just, as the Reed heirs have voluntarily parted with all their title to Bates for a valuable consideration, besides having had the benefit that we may presume enured to them from the guardian's sale; and nobody appears to have actually paid out anything on the land, save the Defendant, and those under whom he claims. We cannot see that any error in law has been committed in reaching the result.

Affirm.